OXFORD HOUSE, INC., ET AL.

      v.

CITY OF SALISBURY, MARYLAND,

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*\*\*\*\*\*

Civil No. RDB-17-1978

## MEMORANDUM

Plaintiffs Oxford House, Inc. ("OHI") and Jeffrey Outten ("Outten") (collectively "Oxford House") bring this action against Defendant City of Salisbury, Maryland ("the City"), alleging that the City's failure to modify its housing regulations to accommodate the disabled residents of three homes they chartered and made available for rent, respectively, violated the Fair Housing Act of 1968 ("FHA"), 42 U.S.C. § 3601, *et seq.*, and Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 1213, *et seq.* Now pending are Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment and Plaintiffs' Motion for Leave to File a Second Amended Complaint. The parties have fully briefed the issues, and no oral argument is necessary. *See* Local Rule 105.6. For the reasons set forth below, Defendant's Motion is treated as a Motion for Summary Judgment and GRANTED, and Plaintiffs' Motion is DENIED.

## BACKGROUND

OHI is a Delaware non-profit corporation with a principal place of business in Silver Spring, Maryland, which assists in the establishment of affordable housing for individuals with

disabilities, including those who are recovering from substance abuse. ECF No. 6, ¶ 4. OHI charters individual Oxford Houses nationally and internationally, including the three homes at issue in this case. *Id.* Each individual Oxford House is an unincorporated association of people recovering from substance abuse who live together in a shared residence and follow three rules: (1) each Oxford House must be financially self-supported; (2) each Oxford House must be democratically run; and (3) anyone who relapses into drug or alcohol use must be immediately expelled from his or her Oxford House. *Id.* at ¶¶ 4, 19, 33.

Jeffrey Outten is the owner of the single family dwellings located at 506 South Park Drive, 809 Camden Avenue, and 504 Georgia Avenue in Salisbury, Maryland. *Id.* at ¶ 5. On December 1, 2011, Outten rented 506 South Park Drive to Oxford House-South Park Drive for use as an Oxford House for a maximum of seven men. *Id.* at ¶ 20. On May 1, 2016, Outten rented 504 Georgia Avenue to Oxford House-Georgia Place for use as an Oxford House for a maximum of eight men. *Id.* at ¶ 22. On July 1, 2016, Outten rented 809 Camden Avenue to Oxford House-Osiris for use as an Oxford House for a maximum of ten men. *Id.* at ¶ 24.

The City is a municipal corporation organized and existing pursuant to the laws of the State of Maryland, which is classified as a public entity under the Americans with Disabilities Act. *Id.* at ¶ 6. Title 15, Chapter 24 of the City of Salisbury Code ("CSC") sets forth regulations known as the "property maintenance code." SALISBURY, MD., MUNICIPAL CODE § 15.24.010 (2018). The intent of the "property maintenance code" is to "establish and maintain basic minimum standards and conditions for the protection of health, safety and general welfare of the public, and to promote the prevention of blight and decay." *Id.* at § 15.24.030. The CSC sets forth certain occupancy limitations. Specifically, pursuant to CSC § 15.24.950(D)(1), "a detached dwelling unit (single house) may be occupied by (a) one family allowing for visiting

2

guest, or (b) not over four unrelated occupants." Pursuant to CSC § 15.24.490, the definition of "family" includes "a group of not more than four persons who are approved by the Housing and Community Development Department pursuant to Section 15.24.1620 as a 'functional family.'"[1]

Section 15.24.1620 provides:

A.  Upon application of a group of not more than four persons, the Housing and Community Development Department shall make a determination of whether a "functional family" exists. Each of the following criteria shall be met:

1.  Share a permanent personal bond and commitment to one another;

2.  Not dependent upon or supported by someone who does not maintain legal domicile at the particular dwelling unit and reside therein (not including any alimony or child support payments made to or for the benefit of any members of the group);

3.  Maintain legal domicile at the particular dwelling unit;

4.  Share a single household budget;

5.  Share in the repair and maintenance of the dwelling unit and its grounds, if any;

6.  Prepare and eat meals together on a regular basis;

7.  Share in legal ownership or tenancy of the dwelling unit, as evidenced on a deed or lease.

B.  In the case of an application by persons who are disabled pursuant to the terms of the Americans with Disabilities Act, the Housing and Community Development Department shall make a determination of whether a "functional family" exists under subsection (A). When making that determination, the Housing and Community Development Department shall make any necessary and reasonable accommodations, including the modification of conditions required by subsection (A) and the allowance of more than four unrelated individuals in the same household, when

---

[1] This provision was recently subjected to a constitutional challenge, which was ultimately dismissed as moot. *See Adams Housing, LLC v. City of Salisbury, Md.*, _ F. App'x _, 2018 WL 1251717 (D. Md. Mar. 12, 2018).

> necessary to comply with applicable federal and state laws regarding fair
> housing and persons with disabilities.

On May 3, 2012, the City notified Outten that he was in violation of CSC § 15.24.1640 because too many unrelated individuals were living together at 506 South Park Drive. ECF No. 6, § 40. It warned Outten that he would face fines if he did not reduce the occupancy. *Id.* On May 25, 2012, OHI's General Counsel sent a letter to the City requesting, pursuant to the FHA, that the City modify the conditions required by § 15.24.1620(A) and grant the more-than-four unrelated individuals living at Oxford House—South Park Drive "functional family" status. *Id.* at § 41. The City never responded to the letter. *Id.* at § 43.

More than four years later, on August 3, 2016, the City sent Outten a similar letter advising him that the use of 809 Camden Avenue was in violation of CSC § 15.24.1620 for the same reason. *Id.* at § 45. On August 15, 2016, the City issued Outten a civil fine for that violation in the amount of $500. *Id.* at § 47. The following day, the City issued Outten another civil fine in the amount of $1,000. *Id.* at § 48. On August 19, 2016, the City sent Outten similar letters regarding 506 South Park Drive and 504 Georgia Avenue. *Id.* at §§ 53, 56.

In two letters, dated August 23 and August 26, 2016, OHI again requested that the City modify the conditions required by § 15.24.1620(A) and grant the more-than-four unrelated individuals living at each of the three Oxford Houses "functional family" status. ECF No. 19-1, ECF No. 19-2.

The City responded via letter on October 19, 2016, stating:

Based on your description of the typical Oxford House it appears that some of the requirements of section 15.24.1620 may be met by each group. In order to determine which of the criteria are met and whether any reasonable accommodation is necessary to comply with applicable federal and state laws, we request that you provide us with the identity of each person included in any group that is seeking the status of a functional family under the code. We will need the individual's full name (and any previous names), date of birth, current address,

4

and any other addresses at which the individual has resided during the past two years. Each group should explain how they meet the criteria of the Code and, if they do not meet the criteria, why and what reasonable accommodations should be made.

. . .

For each member of the group, we will need information regarding the source of any income or support received by that individual. The source should be identified by name, address, and any other information that would enable us to verify a particular individuals' source of income or support. In addition, we will need a copy of the driver's license or some other reasonably accepted identification and household mail or bills showing that the individual in question is domiciled at the home for which the status as a functional family is sought. We also need copies of the household checkbook, budget or other documents to demonstrate that each house maintains a "single household budget." We will require copies of records of maintenance or schedules regarding chores and repairs done at each property to evidence that the applicants share in "the repair and maintenance of the dwelling unit and its grounds." We will need a copy of the current lease showing that the tenants seeking recognition as a functional family share in the tenancy of the unit. If there are any schedules with regard to shopping, meal preparation or clean-up of the property, that information would be helpful.

ECF No. 19-4, pp. 2–3. Noting that Oxford House was "asking that reasonable accommodations be afforded by the City to each member of each group residing in each home," the City asked Oxford House to "provide specific information on each individual to allow the City to make a determination of whether that individual is disabled under the Americans with Disabilities Act." *Id.* at 3. Finally, because Oxford House was asking that each house be granted "functional family" status, the City asked Oxford House to:

[S]ubmit all relevant factual information regarding each group along with any applicable federal or state laws that would mandate the approval of more than four disabled persons as a functional family. If the circumstances of any household require more than four (4) unrelated persons, explain fully why more than four (4) are necessary and provide a sworn affidavit with regard to all such claims.

*Id.* The City noted that "whether any particular group qualifies as a Functional Family is specific to each group making application for approval. All information provided by each group should be specific to that group." *Id.*

Oxford House refused to provide the information requested. It responded via letter on November 28, 2016, stating that it would not provide the "detailed personal information" requested because "the reasonable accommodation request is for . . . households," and not "for each individual resident residing in these houses," and because "the Fair Housing Act does not require the production of such information to process a reasonable accommodation request, nor have you demonstrated a need to have this information." ECF No. 19-5, p. 1. Although Oxford House purported to "recognize the City's need to have necessary information in which to [e]nsure that the Oxford Houses operate as a 'functional family,'" it decided that "the nature of breadth and intrusiveness of [the] request cannot be honored." *Id.* at 5.

The City responded via letter on February 17, 2017, declaring that "[a] determination of functional family status is available only to the residents of a dwelling seeking consideration. It does not apply to the building itself or to any organization with which the residents are affiliated." ECF No. 19-6, p. 1. It noted that while "it appears that the Oxford House is seeking blanket consideration of its houses as functional families and asserting that the individual residents of each dwelling need not apply," "[t]he right to apply for consideration as a functional family belongs to the residents of each alleged single-family home." *Id.* at 2. The City pointed out that, "[r]equests for accommodations can be processed only when sufficient information is provided by the applicants." *Id.* Noting that Oxford House "refused to provide any specific information on behalf of the individual residents of each of the dwellings," the City said it was "unable to determine the identity of the residents, their relationship to each other, whether they

6

are in fact disabled, or whether they are current illegal drug users or have criminal convictions that would exclude them from the protection of the Fair Housing Act (FHA)." *Id.* This in turn prevented it from "determining whether the residents might qualify as functional families (and legally occupy the homes in question) or what accommodations might be necessary to comply with applicable federal and state laws regarding fair housing and persons with disabilities." *Id.* Therefore, it ultimately decided: "the City . . . must deny your requests." *Id.*

On July 14, 2017, Plaintiffs filed the initial Complaint in this case. ECF No. 1. On July 18, 2017, Plaintiffs filed an Amended Complaint as of right. ECF No. 6. On November 22, 2017, the City filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. ECF No. 11. On January 5, 2018, Plaintiffs filed a Motion for Leave to File a Second Amended Complaint. ECF No. 16. Both motions are now pending.

## STANDARD OF REVIEW

Defendant's motion is styled as a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) or, in the Alternative, for Summary Judgment under Fed. R. Civ. P. 56. Both parties have attached exhibits to their submissions. *See* ECF Nos. 11 and 19. A court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). If it does so, "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Therefore, a motion styled in this manner implicates a court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F.Supp.2d 431, 436–37 (D. Md. 2011). A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not

consider it." *Sager v. Hous. Com'n of Anne Arundel Cty.*, 855 F.Supp.2d 524, 542 (D. Md. 2012) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2011 Supp.)). The Court chooses to consider the parties' submissions and therefore treats Defendant's Motion as a Motion for Summary Judgment.

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A material fact is one that may affect the outcome of the suit. *Anderson,* 477 U.S. at 248. In assessing a motion for summary judgment, a court must view the facts, and all inferences justifiably drawn therefrom, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986). It must decide whether there is a genuine issue for trial, "not . . . weigh the evidence and determine the truth of the matter." *Anderson,* 477 U.S. at 249.

Plaintiffs' Motion for Leave to File a Second Amended Complaint is governed by Rule 15(a) of the Federal Rules of Civil Procedure, which provides the general rules for amending pleadings. Fed. R. Civ. P. 15(a) states that where, as here, plaintiffs have already amended their complaint once as a matter of course, they may amend their complaint a second time "only with the opposing party's written consent or the court's leave." In general, leave to amend a complaint pursuant to Rule 15(a) shall be "freely" granted "when justice so requires." Fed. R. Civ. P. 15(a)(2); *see Foman v. Davis,* 371 U.S. 178, 182 (1962); *Lanford v. Prince George's County, Md.*, 199 F. Supp. 2d 297, 300-01 (D. Md. 2002). The matter, however, is committed to the discretion of the district court, and the district judge may deny leave to amend "when the amendment would be prejudicial to the opposing party, the moving party has acted in bad faith,

8

or the amendment would be futile." *Equal Rights Center v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010); *see also Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 769 (4th Cir. 2011).

A court may deny a motion to amend on the grounds that the amendment would be "futile" where the complaint would not be able to survive a motion for summary judgment even with the proposed amendments. *See Waag v. Sotera Def. Sols., Inc.*, 857 F.3d 179, 189 n. 4 (4th Cir. 2017) (district court was "well within its considerable discretion in denying [plaintiff's] motion to amend" where it concluded that summary judgment would be appropriate even with the proposed amendments); *Steinburg v. Chesterfield County Planning Com'n*, 527 F.3d 377, 390 (4th Cir. 2008) (district court did not abuse its discretion by denying a motion to amend where granting the motion "would be an act of futility because [plaintiff's] proposed amended complaint would not survive summary judgment").

## ANALYSIS

### I. Motion to Dismiss or, in the Alternative, for Summary Judgment

#### A. Standing

The City first challenges whether Outten and OHI have standing to bring claims under the FHA and Title II of the ADA. Because there appears to be some confusion between the parties with respect to standing, the Court will provide some clarity regarding the internal workings of that doctrine.

Standing is a jurisdictional doctrine which "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (internal citation omitted). Article III of the United States Constitution supplies the "irreducible constitutional minimum" of standing. *See Lujan v. Defenders of*

9

*Wildlife*, 504 U.S. 555, 560 (1992). To satisfy the Article III standing requirement, a plaintiff must allege that she has: "(1) suffered an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*, _ F. 3d _, 2018 WL 2927626, at *4 (4th Cir. Jun. 12, 2018) (quoting *Spokeo*, 136 S. Ct. at 1540). "[T]he law of Article III standing serves to prevent the judicial process from being used to usurp the powers of the political branches, and confines the federal courts to a properly judicial role." *Spokeo*, 136 S. Ct. at 1547 (internal citations and quotation marks omitted).

Statutes cannot provide standing to plaintiffs who lack it under Article III, *see Spokeo*, 136 S. Ct. at 1547–48 ("it is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing"), but may further limit the category of litigants empowered to bring a particular claim, *see Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386–88 (2014). Whether a statute prevents a litigant from bringing a particular claim has occasionally been referred to as "prudential standing" or "statutory standing." *Id.* at n. 4. However, the Supreme Court has called each of these labels "misleading, since the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case." *Id.* Regardless of what name the analysis is given, a court which has satisfied itself of its jurisdiction—by determining that a plaintiff has constitutional standing— must next decide whether the plaintiff has authority to assert a cause of action pursuant to the particular statute at issue. In answering that question, courts "presume that a statute ordinarily provides a cause of action only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Bank of America Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296,

1302 (internal citations and quotation marks omitted). "Whether a plaintiff comes within the zone of interests is an issue that requires [courts] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* at 1302–03. It is according to this framework that the Court now proceeds.

### 1. Constitutional Standing

The first issue before the Court is whether each Plaintiff can satisfy the "irreducible constitutional minimum" of standing. *See Lujan*, 504 U.S. at 560. To reiterate, in order to satisfy the Article III standing requirement, a plaintiff must allege that she has suffered an "injury in fact" that is "fairly traceable" to the defendant's conduct and "that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547 (citing *Lujan*, 504 U.S. at 560–61).

Outten clearly has Article III standing. He "owns the single family dwellings located at 506 South Park Drive, 809 Camden Ave, and 504 Georgia Ave, Salisbury, Maryland which are being rented as Oxford Houses." ECF No. 6, ¶ 5. Outten has been issued thousands of dollars in civil citations, fees, and fines, and has been prosecuted for renting these three homes as Oxford Houses, in violation of the occupancy limitations set forth in the CSC. ECF No. 6, ¶¶ 47, 48, 61, 92. Because the City's allegedly discriminatory conduct has caused Outten this concrete pecuniary harm, which he seeks to redress through this lawsuit, Outten has Article III standing.

OHI also has Article III standing. An organization can have standing either "as a representative of its members" or "on its own behalf." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982). An organization has standing as a representative of its members where (1) at least one of its members would have standing; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim nor the relief requires the participation of the individual members. *See Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 343

11

(1977). There is reason to doubt whether OHI has representational standing in this case. Indeed, by refusing to identify its members for the court, OHI has made it essentially impossible for the Court to assess whether at least one of its members would have standing in his or her own right. *See, e.g., Kessler Institute for Rehabilitation, Inc. v. Mayor & Council of Borough of Essex Fells*, 876 F. Supp. 641, 656 (D. N.J. 1995) (organization lacked standing where it "failed to identify a single individual member" and therefore the court could not conclude whether any member had "suffered an injury sufficient to confer standing").

The Court need not decide this issue, however, because OHI clearly has standing on its own behalf, for the reasons set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 262–63 (1977). The plaintiff in *Arlington Heights* was a nonprofit corporation with "an interest in making suitable low-cost housing available in areas where such housing is scarce." *Id.* at 263. The nonprofit requested that defendant, a city, rezone a parcel of land so that it could build 190 clustered townhouse units for low and moderate-income tenants on the parcel. *Id.* at 254. The United States Supreme Court found the nonprofit had standing to sue the city for denying this request. *Id.* at 263. Although the nonprofit's interest did not stem "from a desire for economic gain," the Supreme Court pointed out that "economic injury is not the only kind of injury that can support a plaintiff's standing." *Id.* at 262–63. While recognizing that a "mere abstract concern about a problem of general interest," *id.* at 263 (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)), is not a sufficient injury, the Court found that the injury asserted by the nonprofit was sufficient because it related to a specific project. As the Court said, "the specific project [the nonprofit] intends to build, whether or not it will generate profits, provides that 'essential dimension of specificity' that informs judicial decisionmaking."

*Arlington Heights*, 429 U.S. at 263 (quoting *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 221 (1974)).

Here, as in *Arlington Heights*, OHI asserts a noneconomic injury that is sufficiently specific to confer standing. OHI is a nonprofit which "assists in the establishment of affordable housing and support to individuals with disabilities including those who are recovering from substance abuse and/or alcoholism . . . ." ECF No. 6, ¶ 4. As a nonprofit, OHI's interest is not economic. Neither, however, is it a "mere abstract concern about a problem of general interest." *See Arlington Heights*, 429 U.S. at 263. Indeed, OHI challenges the City's decision not to modify its housing ordinances to accommodate three specific homes. *See* ECF No. 6, ¶¶ 20, 22, 24, 107-11. This provides that "essential dimension of specificity," *see Arlington Heights*, 429 U.S. at 263, necessary for an injury to suffice for purposes of the constitutional standing analysis. Because the City's allegedly discriminatory conduct has caused OHI injury, which it seeks to redress through this lawsuit, OHI, like Outten, has Article III standing.

### 2. Authority to Sue Under the Fair Housing Act

Having found that both Plaintiffs have Article III standing, the Court must next decide whether Outten and OHI have the authority to bring suit under the FHA. As the United States Supreme Court explained just last term:

> The FHA permits any "aggrieved person" to bring a housing-discrimination lawsuit. 42 U.S.C. § 3613(a). The statute defines "aggrieved person" as "any person who" either "claims to have been injured by a discriminatory housing practice" or believes that such an injury "is about to occur." § 3602(i).

> This Court has repeatedly written that the FHA's definition of person "aggrieved" reflects a congressional intent to confer standing broadly. We have said that the definition of "person aggrieved" in the original version of the FHA, § 810(a), 82 Stat. 85, "showed 'a congressional intention to define standing as broadly as is permitted by Article III of the Constitution.'" *Trafficante*, supra, at 209, 93 S.Ct. 364 (quoting *Hackett v. McGuire Brothers, Inc.*, 445 F.2d 442, 446 (C.A.3 1971)); *see Gladstone*, supra, at 109, 99 S.Ct. 1601 (similar); *Havens Realty*,

*supra*, at 372, 375–376, 102 S.Ct. 1114 (similar); *see also Thompson v. North American Stainless, LP*, 562 U.S. 170, 176, 131 S.Ct. 863, 178 L.Ed.2d 694 (2011) ("Later opinions, we must acknowledge, reiterate that the term 'aggrieved' [in the FHA] reaches as far as Article III permits"); *Bennett v. Spear*, 520 U.S. 154, 165–166, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) ("[*Trafficante* ] held that standing was expanded to the full extent permitted under Article III by § 810(a) of the Civil Rights Act of 1968").

*Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1303 (2017). According to this standard, because Outten and OHI both have constitutional standing, and because each "claims to have been injured by a discriminatory housing practice," *see* 42 U.S.C. § 3602(i)(1), each has authority to sue under the FHA.

### 3. Authority to Sue Under the Americans with Disabilities Act

The Court must next decide whether Outten and OHI have the authority to bring suit under Title II of the ADA. As the Fourth Circuit explained in *A Helping Hand, LLC v. Baltimore County, MD*, 515 F.3d 356 (4th Cir. 2008):

> [A]lthough Title II contains no express right to be free from discrimination because of association with qualified individuals with disabilities, Title II's enforcement provision does *not* limit its remedies to individuals with disabilities. Rather, Title II expressly provides a remedy to "*any person* alleging discrimination on the basis of disability in violation of section 12132." 42 U.S.C. § 12133 (emphasis added); *see also* 1 U.S.C. § 1 (2000) (defining "person" to include various entities). This broad language in the enforcement provision "evinces a congressional intention to define standing to bring a private action . . . as broadly as is permitted by Article III of the Constitution." *MX Group*, 293 F.3d at 334 (quoting *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir.1997), *superseded by Rule on other grounds as stated in Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001)) (internal quotation marks and alterations omitted).

*Id.* at 363. According to this standard, because Outten and OHI both have constitutional standing, and because each alleges "discrimination on the basis of disability in violation of section 12132," *see* 42 U.S.C. § 12133, each has authority to sue under the ADA.

### B. Merits

14

### 1. Fair Housing Act

Having determined that Plaintiffs have standing, the Court can now address the merits of the City's contention that it is entitled to judgment as a matter of law. Oxford House claims the City violated the FHA when it failed to modify its normal zoning policies to accommodate the recovering alcoholics and substance abusers who occupied the three Oxford Houses in question.[2] 42 U.S.C. § 3604(f)(1) makes it unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." In this context, discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The Fourth Circuit has interpreted this provision to require "an accommodation for persons with handicaps if the accommodation is (1) reasonable and (2) necessary (3) to afford handicapped persons equal opportunity to use and enjoy housing." *Bryant Woods Inn, Inc. v. Howard County, Md.*, 124 F.3d 597, 603 (4th Cir. 1997). It has clarified that, "the FHA does not provide a blanket waiver of all facially neutral zoning policies and rules, regardless of the facts," nor does the FHA "require accommodations that increase a benefit to a handicapped person above that provided to a nonhandicapped person with respect to matters unrelated to the handicap." *Id.* at 603–04 (internal citations and quotation marks omitted).

---

[2] Although Oxford House faults the City for failing to address theories of FHA liability besides the reasonable accommodation theory in its Motion for Summary Judgment, *see* ECF No. 19, p. 15, the City only addresses the reasonable accommodation theory because that is the only theory plausibly alleged in the Amended Complaint, *see* ECF No. 20, pp. 5-6.

The issue before the Court is whether the City violated § 3604(f)(3)(B) when it refused to modify its normal zoning policies to accommodate the Oxford House residents.[3] Each of the three homes in question is located within an area zoned for single-family residences. ECF No. 6, ¶¶ 21, 23, 25. According to the City's normal zoning policies, residences in such areas "may be occupied by (a) one family allowing for visiting guest, or (b) not over four unrelated occupants." SALISBURY, MD., MUNICIPAL CODE § 15.24.950(D)(1) (2018). The definition of "family" includes "a group of not more than four persons who are approved by the Housing and

---

[3] Oxford House has sued on similar grounds in various federal courts nationwide. *See, e.g., City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995) (making only a threshold determination that the city's zoning code was not exempt from the FHA); *Oxford House-C v. City of St. Louis*, 77 F.3d 249 (8th Cir. 1996) (ruling for the city because Oxford House never complied with the city's process for obtaining a reasonable accommodation); *Oxford House, Inc. v. Browning*, 266 F. Supp. 3d 896 (M.D. La. 2017) (finding that Oxford House should have been granted a reasonable accommodation from the requirement that households install extensive and costly fire safety features); *Oxford House, Inc. v. City of Baton Rouge, La.*, 932 F. Supp. 2d 683 (M.D. La. 2013) (finding that Oxford House should have been granted a reasonable accommodation and rejecting the city's argument that Oxford House had not provided it with enough information to make that determination); *Oxford House, Inc. v. City of Wilmington, N.C.*, No. 7:07–CV–61–F, 2010 WL 4484523 (E.D.N.C. Oct. 28, 2010) (ruling for the city because Oxford House failed to demonstrate an accommodation was "necessary" and "reasonable"); *Tsombanidis v. W. Haven*, 180 F. Supp. 2d 262 (D. Conn. 2001), *aff'd in part, rev'd in part sub nom. Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565 (2d Cir. 2003) (finding that Oxford House should have been granted a reasonable accommodation where it properly requested one and the benefits to Oxford House occupants far outweighed the burdens to the city); *Oxford House, Inc. v. City of Virginia Beach, Va.*, 825 F. Supp. 1251 (E.D. Va. 1993) (ruling for the city because Oxford House never complied with the city's process for obtaining a reasonable accommodation); *Oxford House, Inc. v. Town of Babylon*, 819 F. Supp. 1179 (E.D.N.Y. 1993) (finding that Oxford House should have been granted a reasonable accommodation where it properly requested one, the request was reasonable, and granting the request would have no adverse effect on the city); *Oxford House, Inc. v. Township of Cherry Hill*, 799 F. Supp. 450 (D.N.J. 1992) (granting a preliminary injunction preventing enforcement of the township's zoning code because there was no evidence that granting Oxford House a reasonable accommodation would have any negative impact on the township); *Oxford House, Inc. v. City of Albany*, 819 F. Supp. 1168 (N.D.N.Y. 1993) (granting a temporary injunction to afford Oxford House an opportunity to obtain a variance from the city according to the city's normal procedures); *Oxford House-Evergreen v. City of Plainfield*, 769 F. Supp. 1329 (D.N.J. 1991) (granting a temporary injunction permitting Oxford House to exceed the city's maximum occupancy restrictions pending the outcome of a parallel state court proceeding).

Community Development Department pursuant to Section 15.24.1620 as a 'functional family.'"
*Id.* at § 15.24.490. The CSC further provides that "necessary and reasonable accommodations"
should be made for individuals who are "disabled" as that term is defined in the ADA, including
"the modification of [the 'functional family' criteria] and the allowance of more than four
unrelated individuals in the same household, when necessary to comply with applicable federal
and state laws regarding fair housing and persons with disabilities." *Id.* at §15.24.1620(B).

The Court finds that the City's refusal to modify its normal zoning policies to
accommodate the Oxford House residents did not violate 42 U.S.C. § 3604(f)(3)(B). The record
reflects that when Oxford House requested a reasonable accommodation, the City responded in a
sensible fashion: it asked for more information so that it could assess whether an accommodation
was necessary. *See* ECF No. 19-4. Oxford House made no effort to facilitate this process, instead
seeming to assume that the City would rely on its representations alone. *See* ECF No. 19-5.
Whatever the FHA requires, it does not require blind faith in those who request modifications of
a city's normal zoning policies. *See Bryant Woods*, 124 F.3d at 603 ("In enacting the FHA,
Congress clearly did not contemplate abandoning the deference that courts have traditionally
shown to . . . local zoning codes."). Indeed, the United States Circuit Courts of Appeals have
uniformly held that those requesting reasonable accommodations must attempt to comply with a
city's normal procedures for granting modifications of its zoning policies, as long as those
procedures (1) apply equally to all people making such a request and (2) are not obviously futile.
*See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1219 (11th Cir. 2008) (a city must be
"given an opportunity to make a final decision with respect to [a] request, which necessarily
includes the ability to conduct a meaningful review of the requested accommodation to
determine if such accommodation is required by law"); *Oxford House-C v. City of St. Louis*, 77

F.3d 249, 253 (8th Cir. 1996) ("The Oxford Houses must give the City a chance to accommodate them through the City's established procedures for adjusting the zoning code."); *United States v. Village of Palatine*, 37 F.3d 1230, 1234 (7th Cir. 1994); (a city "must be afforded an opportunity to make [a reasonable] accommodation pursuant to its own lawful procedures—unless it is clear that the result of such procedures is foredoomed").

Oxford House argues that it was not required to follow the City's normal procedures for granting modifications for a host of reasons, only two of which are potentially meritorious. First, Oxford House claims it was asked questions that non-disabled individuals would not have been asked, which, it argues, proves the City's procedures do not apply equally to all people. Second, Oxford House claims its request would have been rejected even if it had provided the requested information, which, it argues, proves complying with the City's procedures would have been obviously futile. These arguments are both unavailing.

Oxford House first objects to the fact that the City asked for information that went beyond the seven factors relevant to "functional family" status under § 15.24.1620, ECF No. 19, p. 23, including asking for residents' criminal history, work history, and for production of their government issued identification, *id.* at 27. Despite Oxford House's argument to the contrary, the fact that the City asked for such information does not prove that its procedures apply unequally. Indeed, Oxford House seemingly fails to appreciate that it requested *both* designation as a functional family *and* a modification of the usual rule prohibiting groups of more-than-four individuals from seeking such a designation. Its basis for requesting this modification was its representation that its residents were owed a reasonable accommodation under federal law.

Therefore, in order to act on Oxford House's request, the City had to determine *not only* whether Oxford House could satisfy the normal criteria for designation as a "functional family,"

18

*but also* whether modification of the usual rule prohibiting groups of more-than-four individuals from seeking such a designation was both "reasonable" and "necessary" in light of "applicable federal and state laws regarding fair housing and persons with disabilities." *See* CSC § 15.24.1620(B). Cities have a significant amount of discretion in determining whether an accommodation is both "reasonable" and "necessary." *See Bryant Woods*, 124 F.3d at 604 ("[A] court may consider as factors the extent to which the accommodation would undermine the legitimate purposes and effects of existing zoning regulations and the benefits that the accommodation would provide to the handicapped. It may also consider whether alternatives exist to accomplish the benefits more efficiently.") The City asked Oxford House questions designed to help it exercise this discretion while complying with federal regulations. *See* ECF No. 19-4, pp. 2–4. Oxford House cannot expect the City to grant it an accommodation without providing the City the information necessary to determine whether such an accommodation is both "reasonable" and "necessary." As a court from another jurisdiction put it while rejecting a similar claim by OHI in a separate case, "[t]he Fair Housing Act protects handicapped individuals from discrimination. It does not, and plaintiffs point to no provision of the statute suggesting otherwise, insulate such individuals from legitimate inquiries designed to enable local authorities to make informed decisions on zoning issues." *Oxford House, Inc. v. City of Virginia Beach*, 825 F. Supp. 1251, 1262 (E.D. Va. 1993). For precisely this reason, Oxford House's first objection is unavailing.

Oxford House's second objection is that its request would have been rejected even if it had provided the requested information. *See* ECF No. 19, p. 25. In support of this argument Oxford House cites *United States v. Village of Palatine*, 37 F.3d 1230, 1234 (7th Cir. 1994), where the Seventh Circuit held that a "plaintiff need not resort to [a City's procedures] if such

19

resort is manifestly futile." *Palatine* itself does not help Oxford House, because in that case the Seventh Circuit found that resort to the relevant procedures *would not* have been futile. *Id.* Moreover, the case *Palatine* relied on, *Oxford House-C v. City of St. Louis*, 843 F. Supp. 1556, 1582 (E.D. Mo. 1994), demonstrates the error of Oxford House's position. In *City of St. Louis*, the district court found that resort to the city's normal procedures would have been futile because "the evidence presented showed that aldermanic and community support or opposition ha[s] a strong impact on the outcome of applications for conditional uses and variances," and "[t]he alderman had already expressed his opposition to" the applicants. *Id.* Notably, the record in this case is devoid of similar evidence suggesting that Oxford House's request for a reasonable accommodation was likely to be denied. More strikingly, the district court's ruling in *City of St. Louis* was reversed by the Eighth Circuit, which acknowledged that "the alderman representing the neighborhoods where the Oxford Houses are located does not want the houses to have more than eight residents" but held that, because "[t]he record shows the Board of Adjustments has granted variances despite opposition from neighbors and aldermen," "the district court committed clear error in finding it would be futile for the Oxford Houses to apply for variances." *Oxford House-C v. City of St. Louis*, 77 F.3d 249, 253 (8th Cir. 1996). Here the Court has no reason to believe the City would have denied Oxford House's request for a reasonable accommodation had it provided the requested information. In fact, the Court is not convinced the City would deny Oxford House a reasonable accommodation—assuming its compliance with the proper procedures—even now. Thus, Oxford House's second objection is also unavailing.

In short, because Oxford House refused to comply with the City's normal procedures for granting a modification of its typical zoning policies, the City's decision not to grant Oxford House a reasonable accommodation did not violate 42 U.S.C. § 3604(f)(3)(B) as a matter of law.

### 2. Americans with Disabilities Act

Oxford House's claim that the City violated the ADA by failing to grant the reasonable accommodation fails for the same reason. The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be . . . subjected to discrimination by any [public] entity." 42 U.S.C. § 12132. It bears noting that Oxford House requested a reasonable accommodation only "pursuant to the Federal Fair Housing Act," ECF No. 19-1, p. 1, based on its belief that "the Americans with Disabilities Act does not apply to housing," ECF No. 19-5, p. 1. Even assuming Oxford House's request for a reasonable accommodation was understood to be pursuant to the both the FHA and the ADA, however, this claim fails. Indeed, analysis of reasonable accommodation claims are treated the same under the ADA and the FHA. *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 561 (7th Cir. 2003) ("the requirements for showing failure to reasonably accommodate are the same under the ADA and the FHA[] so we can treat these issues as one"); *see also Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 n. 4 (2d Cir. 2003) ("Due to the similarities between the statutes, we interpret them in tandem."). Thus, just as the City's decision not to grant Oxford House a reasonable accommodation did not violate the FHA because Oxford House refused to comply with the City's request for information, its decision did not violate the ADA for the same reason.

## II. Plaintiffs' Motion for Leave to File a Second Amended Complaint

The second motion pending before the Court is Plaintiffs' Motion for Leave to File a Second Amended Complaint. ECF No. 16. Plaintiffs' Motion will be denied because it would be futile. Indeed, the proposed Second Amended Complaint fails to address the basis for the Court's grant of summary judgment on their reasonable accommodation claim: Oxford House's refusal to comply with the City's request for information. *Compare* ECF No. 16 *with* Section I.B, *supra*.

In fact, the proposed Second Amendment Complaint would add only a single allegation. Namely, that the City retaliated against Outten for filing this action by seeking to hold him in contempt for failing to obey an outstanding court order that he bring the properties in question in compliance with the City's zoning ordinances. *See* ECF No. 16-1, p. 25. Although the Amended Complaint alleged that the City violated Plaintiffs' rights under the FHA by "retaliating against Plaintiffs because of their exercise of their fair housing rights," ECF No. 6, p. 28, it contained no facts supporting that allegation. The proposed amendment is an attempt to substantiate that retaliation claim. Even if the Court were to allow the amendment, however, the retaliation claim would not be able to survive a motion for summary judgment.

"[R]etaliation claims brought pursuant to the FHA are analyzed under the same standards that are applied to retaliation claims brought under Title VII and other employment discrimination statutes." *Hall v. Greystar Management Services, L.P.*, 28 F. Supp. 3d 490, 495 (D. Md. 2014) (citing *Caractor v. Town of Hempstead*, 159 F.3d 1345, 1998 WL 536385, at \*2 (2d Cir. June 11, 1998); *Texas v. Crest Asset Management, Inc.*, 85 F.Supp.2d 722, 733 (S.D. Tex. 2000)). Thus, "[i]n order to prove a claim of retaliation under the FHA, a plaintiff must establish that: (1) the plaintiff was engaged in protected activity; (2) the defendant was aware of that activity; (3) the defendant took adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action." *Hall*, 28 F. Supp. 3d at 495 (citing *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004), *rev'd on other grounds*, 468 F. App'x 283 (4th Cir. 2012)).

The proposed Second Amended Complaint does not state a claim for FHA retaliation because it does not allege a causal connection between protected activity and an adverse action. The proposed Second Amended Complaint identifies this lawsuit, filed on July 17, 2017, as the

22

protected activity on which the retaliation claim is based.[4] *See* ECF No. 16-1, ¶ 94. It identifies

the City's attempt to hold Outten in contempt of court, by way of a December 28, 2017 filing in

the City Circuit Court, as the relevant adverse action. *Id.* at ¶ 95. What Plaintiffs fail to point out,

however, is that the December 28 filing was merely the continuation of a course of action that

preceded the protected activity. Indeed, the City found Outten guilty of violating the City's

occupancy ordinances on March 1, 2017. *Id.* at ¶ 93; ECF No. 18-1. It ordered him to abate the

violation within two months. ECF No. 18-2. Outten failed to do so. *Id.*; ECF No. 16-1, ¶ 95. The

City's decision to seek to hold him in contempt for failing to comply with this order was merely

the logical next step in a course of action that had already begun.

As the United States Supreme Court has made clear, such a sequence of events is

insufficient to establish the causation element of a retaliation claim. In *Clark County School

Dist. v. Breeden*, 532 U.S. 268 (2001), the Supreme Court held that because the defendant was

contemplating taking an adverse action against the plaintiff *before* the plaintiff engaged in

protected activity, the fact that the defendant took the adverse action *after* the plaintiff engaged

in protected activity was not evidence that the adverse action was retaliatory. Indeed, the Court

said, "proceeding along lines previously contemplated, though not yet definitively determined, is

no evidence whatever of causality." *Id.* at 272; *see also Hollowell v. Kaiser Found. Health Plan

of the Nw.*, 705 F. App'x 501, 504 (9th Cir. 2017) ("reliance on temporal proximity to show

causation fails because one of the adverse actions that [plaintiff] alleges was the next step in a

continuing course of action that began before he filed the internal complaint"); *Kenfield v.*

---

[4] Plaintiffs' memorandum in support of their Motion to Amend makes reference to a HUD
complaint filed on May 4, 2011 as a second instance of protected activity on which the
retaliation claim is based. *See* ECF No. 16, p. 10. However, the proposed Second Amended
Complaint itself makes no reference to any such HUD complaint. *See* ECF No. 16-1. Therefore,
the Court treats the instant suit as the sole protected activity on which Plaintiffs' retaliation claim
is based.

*Colorado Dept. of Public Health & Env't*, 557 F. App'x 728, 733 (10th Cir. 2014)

("[C]ontinuance of the alleged hostility . . . cannot be retaliatory as the plaintiff herself alleges the hostility existed *prior* to the protected activities. The protected activity therefore could not have *caused* the hostility.").

Absent any evidence besides the sequence of events, there is no reason to believe that the City's decision to seek to hold Outten in contempt was a result of his bringing this action and not a result of his failure to comply with the City's March 1, 2017 order. Therefore, even were the Court to allow Plaintiffs to file the proposed Second Amended Complaint, it would not survive a motion for summary judgment. In such a circumstance, amendment would be futile. Accordingly, the Court will not grant Plaintiffs leave to file a Second Amended Complaint.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED and Plaintiffs' Motion for Leave to File a Second Amended Complaint is DENIED. A separate order follows.

$\underline{\text{June 26, 2018}}$
Date

$\underline{\hspace{2cm}\text{/s/ Rich D. Bennett}}$

Richard D. Bennett
United States District Judge